UNITED STATES TELEPHONE CO. v. CENTRAL UNION TELE-
PHONE CO. et al.

(Circuit Court, N. D. Ohio, W. D.   May 20, 1909.)

No. 2,127.

**1.** INJUNCTION (§ 114*)—INDISPENSABLE PARTIES—SUITS INVOLVING VALIDITY
OF CONTRACTS.

To a suit by a long-distance telephone company having exclusive contracts with local companies binding the latter not to make or permit connections with their lines by any other long-distance company for a term of years, to enjoin other companies doing a long-distance business from making connections and interchanging business with such local companies in violation of their contracts with complainant, the local companies are indispensable parties, the validity of the alleged contracts between them and complainant and their rights thereunder being necessarily involved.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 211–218; Dec.
Dig. § 114.*]

**2.** MONOPOLIES (§ 20*)—COMBINATIONS PROHIBITED—CONTRACTS FOR EXCLUSIVE
CONNECTIONS BETWEEN TELEPHONE COMPANIES.

Under the public policy of the state of Ohio, as evidenced by the decisions of its courts and its general statutes relating to monopolies and contracts in restrain of trade, a contract between a local telephone company and a long-distance telephone company for a connection between their lines and the use of the local lines for the sending and receiving of long-distance messages, which binds the local company not to permit any similar connection by any other long-distance company for a term of 99 years, thus disabling it from giving its subscribers the benefit of competition in long-distance service and from extending the field of such service beyond

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the lines of the other party, is void both as tending to create a monopoly and as denying to persons similarly situated the same privileges accorded to others. Conceding that a local company is not bound to permit any long-distance connection with its exchange, yet when it extends that right to one company it is under legal duty as a public service corporation to extend the same right to others.

[Ed. Note.—For other cases, see Monopolies, Dec. Dig. § 20.*

Monopolistic contracts—Validity as affected by public policy, see note to Cravens v. Carter-Crume Co., 34 C. C. A. 486.]

In Equity. On motion for preliminary injunction.

W. L. Cary, Jr., Cable & Parmenter, and Brown, Geddes, Schmettau & Williams, for complainant.

Doyle & Lewis and Paxton & Warrington, for defendants.

TAYLER, District Judge. A temporary restraining order was issued on the filing of the bill, and later the case was heard on the question as to whether the order should continue in force. This raised the question whether on the bill and the affidavits the complainant was entitled to an injunction.

The bill is very long, and, for the purposes of this opinion, is sufficiently summarized as follows:

Complainant alleges that it is a telephone company engaged in long-distance service. That the Central Union Telephone Company and the American Telephone & Telegraph Company are what are known as Bell Companies, the former being local to Ohio, Indiana, and Illinois, while the American Telephone & Telegraph Company is the parent Bell Company.

The bill alleges that the Bell Company seeks to monopolize the telephone business of the country. That for many years it succeeded in doing so. That it refused, during the period of its monopoly, to give long-distance and local service to communities that needed it, and altogether conducted itself in a very arbitrary and high-handed manner. That about 10 years ago, in consequence of these conditions and the necessities of the several communities which were denied the telephone service which they required, the complainant company was organized, and at an expense of more than $5,000,000 constructed and acquired numerous telephones, telephone lines, and exchanges in the several states. That it has largely, and, indeed, enormously, developed the telephone facilities of the country, and in this and adjoining states has a larger number of exchanges and telephones than the Bell Companies have.

The bill alleges that prior to the organization of the complainant company, as well as since, a large number of communities in Ohio, Indiana, and Illinois which had been denied the privilege of local telephone service by the Bell Companies established their own independent systems, and to most of these independent systems the Bell Company refused long-distance service.

Complainant, in order to obtain some assurance of success in carrying on the business of a long-distance telephone company, commenced shortly after its organization, and has continued since that time up to

a recent date, to make contracts with the various local independent companies. The purpose of these contracts was to bind the local companies to permit no connection to be made with any other long-distance telephone company than the complainant for a period of 99 years. A typical contract is attached to the bill, and the provisions important to this inquiry are the last paragraph of the second section, as follows:

"And said parties agree not to enter into any contract with any other person, firm or corporation, whereby any of the rights, privileges or advantages herein acquired by either party may be impaired, except as provided in paragraph 4 hereof."

And paragraph 14:

"This contract shall be and remain in force for and during the period of ninety-nine years from date hereof and thereafter until one year's written notice shall have been given by either party to the other of its intention to terminate the same."

The bill alleges that, by reason of a conspiracy between the two defendants, 16 local independent telephone companies in Ohio, all of which had theretofore entered into contracts with the complainant, similar to that just quoted, have been induced to violate these contracts and to permit the defendant Central Union Telephone Company to connect its lines with the several local independent exchanges, thereby enabling the defendants to receive and transmit, and that they were receiving and transmitting, long-distance messages originating at or destined to the exchanges of the several independent companies above mentioned which otherwise would have been sent over complainant's lines, thereby depriving complainant of the benefit of the exclusive contracts which they had entered into, to its great damage.

The bill further alleges that the defendants are endeavoring to induce other independent telephone companies having similar contracts to violate them in the same manner.

It is alleged that this proposed action, as well as the consummated action, with the independent telephone companies, is an attempt to effect a combination and consolidation of competing telephone properties, in violation of the statutes of Ohio, and that it is also an attempt to monopolize part of the trade or commerce among the several states, and is in violation of the act of Congress known as the "Sherman Anti-Trust Act" (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]), and that the purpose of the defendants is to destroy all competition by destroying the value of complainant's property.

Allegations are made of the multiplicity of suits which would be necessary if actions were brought in respect to each company which has already entered into a contract with the complainant, and it therefore seeks to settle the rights of the parties with respect to all of them in one suit.

There are many other averments which do not bear upon the vital questions in the case, and need not further be referred to.

The prayer of the bill is that the defendants, their agents, servants, employés, etc., be restrained from in any manner violating any of the contracts between the United States Telephone Company and any of the companies forming a part of the independent telephone system for

the full terms of the contracts, and from connecting the lines of the defendants, or either of them, with the exchanges, switch boards, or systems of any of the independent companies with which the United States Telephone Company has contracts for exclusive interchange of telephone business; that the defendants be enjoined during the term of the exclusive contracts from delivering telephone messages to or receiving telephone messages from any of the independent telephone companies with which exclusive contracts existed; that the defendants be enjoined from continuing the connections already existing between them and the systems, lines, switch boards, or telephones of the 16 companies with which they have already made connections; and, generally, that they be restrained from doing any acts which will result in the diversion from the United States Telephone Company of the business to which it is entitled by virtue of the exclusive contracts referred to.

The bill also prays that the defendants be enjoined from entering into or carrying out any contract or conspiracy with any competing telephone company in restraint of trade or commerce among the several states, and from selling its or their property, plants, or exchanges, or any part thereof, to any person, firm, or corporation competing with the defendants or either of them in the telephone business in the states of Ohio, Indiana, Michigan, New York, Pennsylvania, or West Virginia, and from purchasing the property, plants, or exchanges, or any part thereof, of persons, firms, or corporations engaged in the telephone business in competition with the defendants, or either of them, in such manner as to prevent competition, and from consolidating, merging with, or dividing territory with any such competing companies in such manner as to prevent competition.

There is also a prayer to enjoin the defendants from circulating false and defamatory publications, circulars, pamphlets, etc., to which reference is made in the body of the bill.

It will thus be seen that the prayer of the bill is fourfold: (1) To enjoin the defendants from inducing any of the independent telephone companies having exclusive contracts with the complainants from breaking their contracts, or from making any connections with defendants' lines, which, it is claimed, would be a breach of such contracts. (2) To enjoin the defendants from continuing the connections which have already been made with 16 local independent telephone companies in Ohio, which have permitted such connections to be made, and which are giving long-distance telephone business to the defendants. (3) To restrain the defendants from violating the Ohio statute and the Sherman anti-trust act. (4) To enjoin them from distributing false and defamatory publications.

The relative insignificance of the subject of the last of these prayers is such that it was not to any considerable extent discussed in the argument.

Three important questions are presented in the discussion of the rights to which the complainant is entitled under the allegations of the bill: (1) Whether all of the necessary parties have been brought into the case. (2) Whether, under the allegations of the bill, the complainant is entitled to relief under the Sherman anti-trust act. (3)

Whether, if the court has jurisdiction, an injunction will lie to prevent the defendants from making connections with the lines of local independent telephone companies which have entered into with the complainant the exclusive contracts described.

1. In view of the conclusion to which I have arrived as to the third of these questions, it becomes unnecessary to discuss the first as fully as I otherwise would. I have rather extensively examined the authorities bearing on the question of the jurisdiction of this court to determine the issues here presented, as against the local independent companies, which are severally parties to the exclusive contracts, without their presence in this case. While the question is not free from doubt, I am of the opinion that no such relief as the complainant seeks to obtain by this bill can be granted without the presence of these local independent telephone companies.

I think I have examined all of the cases cited, and have analyzed many of them, for the purpose of arriving at a conception of the principle involved. If the case turned wholly upon that question, I would take pains to more amply elaborate the references to these authorities and my construction of them. It is enough to say that in my opinion, while it may be said that a court of equity has authority to restrain an individual from pursuing an immoral or unrighteous course of conduct, it will not do so where the effect of such action by the court is to definitely determine contract rights belonging to or inhering in persons who are not parties to the litigation. The effect, for instance, of a decree enjoining one of the defendants from continuing physical connections with a local independent company with which it now has telephone connections by virtue of some contract which they have seen fit to enter into, would be to determine as a finality against the local independent company, not a party, that it had no right to make a contract with the defendants or either of them, and to put an end to the operation of a contract which it has made, or has sought to make, with the defendant companies, without giving the local company an opportunity to come in and assert that the contract which it made with the complainant is void or invalid or was without consideration, or from presenting any other defense or claim against the validity or existence of its so-called exclusive contract with the complainant, or from showing that its contract with the defendants is valid and valuable.

The general rule is so clearly stated and so amply sustained on reason and authority by Mr. Chief Justice Fuller in the case of State of California v. Southern Pacific Company, 157 U. S. 229–249, 15 Sup. Ct. 591, 599, 39 L. Ed. 683, that I am content to quote from it the general rule of law:

"It was held in Mallow v. Hinde, 12 Wheat. 193, 198, 6 L. Ed. 599, that where an equity cause may be finally decided between the parties litigant without bringing others before the court who would, generally speaking, be necessary parties, such parties may be dispensed with in the Circuit Court if its process cannot reach them or if they are citizens of another state; but if the rights of those not before the court are inseparably connected with the claim of the parties litigant, so that a final decision cannot be made between them without affecting the rights of the absent parties, the peculiar constitution of the Circuit Court forms no ground for dispensing with such parties. And the court remarked: 'We do not put this case upon the ground of jurisdiction, but upon a much broader ground, which must equally apply to all courts

of equity, whatever may be their structure as to jurisdiction. We put it upon the ground that no court can adjudicate directly upon a person's right, without the party being actually or constructively before the court.'

"In Shields v. Barrow, 17 How. 130, 15 L. Ed. 158, the subject is fully considered by Mr. Justice Curtis, speaking for the court. The case of Russell v. Clarke's Executors, 7 Cranch, 98, 3 L. Ed. 271, is there referred to as pointing out three classes of parties to a bill in equity: '(1) Formal parties. (2) Persons having an interest in the controversy, and who ought to be made parties, in order that the court may act on that rule which requires it to decide on and finally determine the entire controversy, and do complete justice, by adjusting all the rights involved in it. These persons are commonly termed necessary parties; but if their interests are separable from those of the parties before the court, so that the court can proceed to a decree, and do complete and final justice, without affecting other persons not before the court, the latter are not indispensable parties. (3) Persons who not only have an interest in the controversy, but an interest of such a nature that a final decree cannot be made without either affecting that interest, or leaving the controversy in such a condition that its final termination may be wholly inconsistent with equity and good conscience.' * * *

"And Mr. Justice Curtis added: 'It remains true, notwithstanding the act of Congress and the forty-seventh rule, that a Circuit Court can make no decree affecting the rights of an absent person, and can make no decree between the parties before it, which so far involves or depends upon the rights of an absent person that complete and final justice cannot be done between the parties to the suit without affecting those rights. To use the language of this court, in Elmendorf v. Taylor, 10 Wheat. 167, 6 L. Ed. 289: "If the case may be completely decided, as between the litigant parties, the circumstance that an interest exists in some other person whom the process of the court cannot reach, as if such party be a resident of another state, ought not to prevent a decree upon its merits." But if the case cannot be thus completely decided, the court should make no decree.'

"Mr. Daniell thus lays down the general rule: 'It is the constant aim of a court of equity to do complete justice by deciding upon and settling the rights of all persons interested in the subject of the suit, so as to make the performance of the order of the court perfectly safe to those who are compelled to obey it, and to prevent future litigation. For this purpose all persons materially interested in the subject ought generally, either as plaintiffs or defendants, to be made parties to the suit, or ought by service upon them of a copy of the bill, or notice of the decree, to have an opportunity afforded of making themselves active parties in the cause, if they should think fit.' 1 Dan. Ch. Pl. & Pr. (4th Am. Ed.) 190.

"The rule, under some circumstances, not important to be considered here, may be dispensed with when its application becomes extremely difficult or inconvenient. Equity Rule 48.

"Sitting as a court of equity we cannot, in the light of these well-settled principles, escape the consideration of the question whether other persons who have an immediate interest in resisting the demand of complainant are not indispensable parties, or, at least, so far necessary that the case should not go on in their absence. Can the court proceed to a decree as between the state and the Southern Pacific Company, and do complete and final justice, without affecting other persons not before the court, or leaving the controversy in such a condition that its final termination might be wholly inconsistent with equity and good conscience?"

There is a wealth of authority to the same effect.

The English cases, upon which such great emphasis was laid by counsel for complainant—Lumley v. Gye, 75 English Common Law Reports, 216 (2 Ellis & Blackburn), decided 1853, Temperton v. Russell, vol. 4, Reports, Decisions of the Court of Appeals on appeal from the Queen's Bench, p. 376, decided 1893, and Quinn v. Leathen, Law Rep. App. Cas. 1901, House of Lords, p. 495—on being analyzed, do not at all warrant the claim that they furnish precedents for the grant-

ing of the kind of relief which is sought here. Nor do the Ticket Scalper Cases justify the contention. (Bitterman v. Louisville & Nashville Railroad Co., 207 U. S. 205) 28 Sup. Ct. 91, 52 L. Ed. 171. Counsel for complainant cite and emphasize the case of People's Telephone & Telegraph Co. v. East Tennessee Tel. Co., 103 Fed. 212, 43 C. C. A. 185, which went to the Circuit Court of Appeals of this circuit from the Eastern district of Tennessee. As to this case, it is claimed that the Circuit Court of Appeals held that jurisdiction would lie in the absence of one of the interested parties. In a measure that is true, but that was a case where there was an interference in the nature of a trespass with the physical property of the complainant. Jurisdiction might well attach in such a case as that for reasons which are not present here.

The effect of sustaining the bill and the manifest purpose is to order a specific performance of the exclusive contract with the complainant. For, if we decree that the defendant may not make a contract with one of the local companies, then we have decreed a specific performance of the contract between complainant and the local companies to the effect that the local companies may not make any connection with any other long-distance company for 99 years. This is sought without asking the other party to the contract whether it consents to have an effective decree against it which shall settle its contract rights with the complainant and the defendants.

2. In view of the conclusion to which I have come on the third proposition discussed, it would be purely academic to discuss the second question as to whether the complainant can invoke against the defendants the provisions of the Sherman anti-trust act. Indeed, so far as the allegations of the bill are concerned, it is the complainant which is proceeding in violation of the Sherman anti-trust act. This will appear from the discussion of the next proposition.

3. Interesting, however, as the question of parties is, I prefer to rest my conclusion on the ground that the contract between the complainant and the local independent telephone companies is (1) contrary to public policy and void, and (2) in violation of the common law and of the statute of Ohio requiring equality and impartiality of service to all persons similarly situated.

The substance of that contract, stated in its strongest form, is this: That, in consideration of the building of the United States Telephone Company's lines to a connection with the local independent company's line, the local company will permit the United States Company to use the top cross arm of its poles upon which to string its long-distance wires to a connection with the switch board of the local company. The local company is to receive a certain portion, not exceeding a certain maximum amount, of the toll charge on long-distance messages, and agrees that it will not permit any other telephone company to make any connection with its line or exchange for a period of 99 years. That is to say, the United States Company, the complainant, acquires by this contract a monopoly of the long-distance service which the patrons of the local company may obtain or possess through the local exchange.

Can a long-distance company in the state of Ohio acquire the exclusive right to furnish long-distance service to the patrons of a local telephone company?   Can a local telephone company, existing and exercising its rights and powers under the law of Ohio, disable itself from giving to its patrons competition in long-distance service?   Can it connect its exchange with a long-distance company's line and refuse to give the same connection to the line of another long-distance company, or can it, by contract, disable itself from permitting another long-distance connection?

In order to answer these questions, we must first examine the statutes and decisions of Ohio to discover what the public policy of the state is, and, as enlightening us in this inquiry, the common law touching the question.

Section 3471 of the Revised Statutes of Ohio provides that telephone companies shall have the same powers and be subject to the same restrictions as are provided by law for telegraph companies.

Section 3470 provides:

"Where two or more telegraph companies whose several lines are not parallel or in competition with each other, and when so united will form a continuous line for receiving and transmitting dispatches, desire to consolidate into a single corporation, they may do so in the manner and subject to the rules provided in chapter 2 for the consolidation of railroad companies."

Section 3455 provides:

"Any such company may construct, own, use and maintain any line or lines of magnetic telegraph, whether described in its original articles of incorporation or not, and whether such line or lines are wholly within or partly beyond the limits of this state, and may join with any other company or association in conducting, leasing, owning, using or maintaining such line or lines, upon such terms as may be agreed upon between the directors or managers of the respective companies, and such companies may own and hold any interest in any such line or lines or may become lessees of any such line or lines upon such terms as may be agreed upon; but it shall be unlawful for any such company or companies and the owner or owners of rights of way to contract for the exclusive use thereof for telegraphic purposes."

Section 3462 provides:

"Every company, incorporated or unincorporated, operating a telegraph line in this state, shall receive dispatches from and for other telegraph lines; and from or for any individual; and on payment of its usual charges for transmitting dispatches as established by the rules and regulations of the company, shall transmit the same with impartiality and good faith, under a penalty of one hundred dollars for each case of neglect or refusal so to do, to be recovered with cost of suit, by civil action in the name and for the benefit of the person or company sending or forwarding or desiring to send or forward the dispatch."

Section 4427–1 (the so-called "Valentine Anti-Trust Law," § 1) provides:

"A trust is a combination of capital, skill or acts by two or more persons, firms, partnerships, corporations or associations of persons, or of any two or more of them for either, any or all of the following purposes:

"(1) To create or carry out restrictions in trade or commerce.

"(2) To limit or reduce the production, or increase, or reduce the price of merchandise, or any commodity.

"(3) To prevent competition in manufacturing, making, transportation, sale or purchase of merchandise, produce or any commodity.

"(4) To fix at any standard or figure, whereby its price to the public or

consumer shall be in any manner controlled or established, any article or commodity of merchandise, produce or commerce intended for sale, barter, use or consumption in this state.

"(5) To make or enter into or execute or carry out any contracts, obligations or agreements of any kind or description, by which they shall bind or have bound themselves not to sell, dispose of or transport any article or any commodity or any article of trade, use, merchandise, commerce or consumption below a common standard figure or fixed value, or by which they shall agree in any manner to keep the price of such article, commodity or transportation at a fixed or graduated figure, or by which they shall in any manner establish or settle the price of any article, commodity or transportation between them or themselves and others, so as to directly or indirectly preclude a free and unrestricted competition among themselves, or any purchasers or consumers in the sale or transportation of any such article or commodity, or by which they shall agree to pool, combine or directly or indirectly unite any interests that they may have connected with the sale or transportation of any such article or commodity, that its price might in any manner be affected. Every such trust as is defined herein is declared to be unlawful, against public policy and void."

Whether or not a telephone company is subject to the provisions of the Valentine law is immaterial. It is quoted here for the purpose of throwing light upon the question as to what is the settled policy of the state.

In the case of State of Ohio ex rel. v. Telephone Co., 36 Ohio St. 296, 38 Am. Rep. 583, the action was for a writ of mandamus to require the Columbus Telephone Company to put up and maintain a telephone for the relator, the American Union Telegraph Company, which it had refused to do for the reason that it had a contract requiring it to give to the Western Union Telegraph Company, and no other telegraph company, the use of its telephone exchange. The complaint alleged that such exclusive use of said telephone wires was an unjust discrimination against relator, and a violation of the duty of the defendants and of their obligation to serve the public indiscriminately. The court, in its opinion, said:

"Whether any such duty, upon the principles of the common law, is owing from respondents or either of them to the relators as members of the general public, as is claimed by them, growing out of the nature of the business in which the respondents are engaged and their relations to the public generally, we need not stop to inquire, as, in our opinion, the whole question between the parties may be determined by the provisions of the statute in such case made and provided."

The court then held that the action of the respondents was in violation of the Revised Statutes of Ohio prescribing the powers and duties of magnetic telegraph companies (sections 3454–3471), and further says:

"We do not mean to say that, as between the Columbus Telephone Company and the American Bell Telephone Company, the right to control the receipt and delivery of telegraph messages might not have been reserved to the latter company; but we do hold that no such right could be reserved whereby the relators could be deprived of the use of the system of telephones organized and managed by these telephone companies, either jointly or severally.

"And in regard to the American Bell Telephone Company it is enough to say, after what has already been said in relation to the Columbus Telephone Company, that it cannot be permitted to operate a line or a system of telephones in this state, and in the face of the statute, either directly or through the agency of licensees, without impartiality, or, in other words, with discrimina-

tions against any member of the general public who is willing and ready to comply with the conditions imposed upon all other patrons or customers who are in like circumstances. And all contracts in contravention of the public policy of this state, as declared in chapter 4 of the Revised Statutes, above referred to, must be declared void and of no effect."

The last paragraph quoted is decisive, it seems to me, of the rights of the complainant here. It will be more fully discussed hereafter.

In the case of Central Ohio Salt Company v. Guthrie, 35 Ohio St. 666, the syllabus reads:

"A voluntary association of salt manufacturers was formed for the purpose of selling and transporting that commodity. By the articles of association, all salt manufactured or sold by the members, when packed in barrels, became the property of the company, whose committee was authorized and required to regulate the price and grade thereof, and also to control the manner and time of receiving salt from the members; and each member was prohibited from selling any salt during the continuance of the association, except by retail at the factory, and at prices fixed by the company. *Held*, that such agreement was in restraint of trade, and void as against public policy."

The court, at page 672, says:

"The clear tendency of such an agreement is to establish a monopoly, and to destroy competition in trade, and for that reason, on grounds of public policy, courts will not aid in its enforcement. It is no answer to say that competition in the salt trade was not in fact destroyed, or that the price of the commodity was not unreasonably advanced. Courts will not stop to inquire as to the degree of injury inflicted upon the public; it is enough to know that the inevitable tendency of such contracts is injurious to the public."

In Lufkin Rule Co. v. Fringeli, 57 Ohio St. 596, 608, 49 N. E. 1030, 1034, 41 L. R. A. 185, 63 Am. St. Rep. 736, it is said:

"But beyond this there is still another consideration connected with such monopolies and combinations that is not to be overlooked from the standpoint of sound political wisdom and economy. It is to the interest of the republic that there should be, measurably, an equality in the fortunes of its citizens, and one of the best modes of accomplishing this, without the use of arbitrary means, is by encouraging separate and independent employments, and by discouraging by law and its administration in the courts all tendencies to the concentration of property in the hands of the few—a condition in which there will be a constant unrest and dissatisfaction among the masses that can bode no good to the nation. It may be safely affirmed that free institutions cannot long be maintained among a people where a few, possessed of great wealth, are the employers and the many are mere laborers, wholly dependent on wages as a means of supporting themselves and families. These considerations, and others of a like character, constitute in great measure that sound public policy which looks with distrust upon all agreements in restraint of trade, and particularly such as may be used in the formation of monopolies, and the control by a few of all individual pursuits. * * *

"The reasoning of the cases in which a departure from the common law had been adopted fails to persuade us that we should disregard the rule that has been so long settled in this state by the decisions of this court; on the contrary, the changed conditions, on which the argument proceeds, tend the more strongly to convince us that, in the interest of a wise public policy, it should be more firmly adhered to."

Having thus enlightened ourselves as to the public policy of the state of Ohio, as declared by its statutes and its courts, let us examine the claims of the parties touching the validity of the contract.

The chief contention of the defendant is (1) that the contract is invalid because it disables the local telephone company from the

performance of the duties which the law lays upon it; (2) that it is void as against public policy in that it tends to create a monopoly.

When we come to reason out the effect of the contract, it will be quite as convenient to deal with both of the grounds of objection above referred to at the same time; they are inextricably related to each other. The contention of the complainant, against the proposition that the contract is invalid because exclusive, is that under the charter, powers of the local telephone company it is not required to furnish, a connection with a long-distance company or to give its patrons long-distance service; that it is a common carrier within the limits of its own exchange and over its own line, among its own patrons; but that, since it is not required by law to extend its service beyond its local use, it violates no provision of the statute and no rule of law when it gives to a long-distance company the exclusive right to make long-distance connections with its exchange; so that, if it disables itself from giving its patrons competition in long-distance service, it only disables itself from doing that which by law it was not required to do at all. It is also contended, in this connection, that since the local company has the power to consolidate itself with another company or to lease its property to another corporation—in effect, the right to abandon its power to act as a corporation—this is a larger power and involves a greater annihilation of its own power than to give by contract the exclusive right to a long-distance company to furnish long-distance service, and that, since it may do the greater and larger thing, it may do the lesser. The fallacy of this particular contention is to be found in the fact that the lessee or consolidated company is not, by the act of lease or consolidation, disabled to perform any of the duties which by law may have rested on the lessor or constituent company. There still remains in either case—lease or consolidation—a company operating the local telephone system, and upon it rests, as formerly rested on the original constituent local company, the duty which the law laid upon it. Whatever may be the temper or the policy of the successor company respecting the matter of continuing to monopolize the local and long-distance business of the community, it will not by such lease or consolidation have parted with its power to give competitive service. Thus it will continue to have power to satisfy the legal necessities springing out of the fact that it is a corporation.

But let us now proceed to the question of the effect to be given to this contract, as to being void or valid, by reason of the fact that in making it the local company disabled itself for 99 years from making any other contract for long-distance connection.

First. Is it true that the local company is not bound by any public duty to give long-distance service to its patrons?

Second. If it is not so bound, may it nevertheless bind itself to give such connection to only one long-distance company, and thus to have the right to deny a similar connection to another long-distance company or disable itself from the power of permitting such other connection?

First. While this case, according to my view, is to be decided by the answer which I give to the second question, it seems to me not improper to submit a few observations on the first question. Counsel for

the complainant, as illustrative of their position, cite the case of Chicago, St. Louis & New Orleans Railroad Co. v. Pullman Company, 139 U. S. 79, 11 Sup. Ct. 490, 35 L. Ed. 97. This was a suit on a contract between the railroad company and the Pullman Company, and it was objected that no recovery could be had under the contract for incidental liability growing out of it because the contract was void in that it provided that exclusive rights were given to the Pullman Company for the term of 15 years to furnish sleeping cars to the railroad company. The proposition of the syllabus in respect to this point is as follows:

"The contract was not void as being in general restraint of trade or against public policy. The contract is to be interpreted in view of the condition implied by law that the sleeping car company should furnish cars not only adequate and safe, but sufficient in number for the use of the public traveling over the lines of the railroad company. Such condition was not, and could not have been, dispensed with."

If the contract between the United States Company and the local telephone companies provided, or if by law it could be implied from the contract, that adequate and sufficient long-distance service should be furnished to the patrons of the local telephone company, we would have a case before us to some extent analogous to the Pullman Case. It is not contended that the United States Telephone Company can connect the subscribers of the local telephone company with all of the telephone subscribers over the country with whom the local subscribers may wish to communicate. One effect of the connection between the defendants and the local telephone subscribers is to give to the local subscribers direct communication with telephone subscribers elsewhere with whom the complainant cannot give connection.

There are other reasons growing out of the different character of the telephone service why the case just quoted is not applicable to the situation here; that is to say, the telephone subscriber must, in order to have efficient and satisfactory long-distance service, be able to talk to the individual with whom he desires to have conversation. He cannot relay his conversation as passengers can change cars, or freight can be transferred from one station or road to another. The act of speaking over a telephone is single and instantaneous, and is to be radically distinguished in its character from an act of transportation. When the contract that the Pullman Company makes with the railroad company provides that it will furnish adequate, safe, and sufficient cars for service on a railroad, and a certain regulation can be had through the Legislature of the rate of charge, it does not matter very much to the user of the railroad whether the Pullman Company has, for a period of 15 years or any other time, an exclusive contract or not. When he travels on a railroad in a Pullman, he is accommodated, and it would be folly to undertake to satisfy the varied tastes of travelers upon a railroad to the extent of giving him his pick of parlor or sleeping cars.

Adequate Pullman car service does not require that Pullman cars should run from every little or big town to every other town which is on a railroad. But "adequate" telephone service may be, and before many years have passed will be, such service as will permit the sub-

scriber at one exchange to immediately talk with any person anywhere in this country.

The opinion of the Supreme Court of the United States in the Express Cases, 117 U. S. 1, 6 Sup. Ct. 542, 628, 29 L. Ed. 791, is cited as supporting the proposition that an exclusive contract of the character involved in this case is not against public policy. It is sufficient, in this connection, to quote from the opinion of Chief Justice Waite to show how radically different that case is from this, and to illustrate by his cogent language the reason why an exclusive contract might be made with an express company:

"The reason is obvious why special contracts in reference to this business are necessary. The transportation required is of a kind which must, if possible, be had for the most part on passenger trains. It requires not only speed, but reasonable certainty as to the quantity that will be carried at any one time. As the things carried are to be kept in the personal custody of the messenger or other employé of the express company, it is important that a certain amount of car space should be especially set apart for the business, and that this should, as far as practicable, be put in the exclusive possession of the expressman in charge. As the business to be done is express, it implies access to the train for loading at the latest, and for unloading at the earliest, convenient moment. All this is extremely inconsistent with the idea with an express business on passenger trains free to all express carriers. * * * The car space that can be given to the express business on a passenger train is, to a certain extent, limited; and, as has been seen, that which is allotted to a particular carrier must be, in a measure, under his exclusive control. * * * On important lines one company will at times fill all the space the railroad company can well allow for the business. If this space had to be divided among several companies, there might be occasions when the public would be put to inconvenience by delays which could otherwise be avoided."

The telephone business, as I have already indicated, is an entirely different thing from Pullman car or express business. The use of the telephone is familiar, but it is perhaps well to formulate it here, in order to satisfy the logical necessities of this opinion. A telephone subscriber in one of the smaller towns in Ohio, served by a local independent telephone company, may desire to talk to some person in Cleveland, Columbus, Chicago, Kalamazoo, or any small town where there is a telephone exchange in any state which the telephone reaches. One long-distance telephone company may reach the subscriber and the other may not. If he cannot have a wire connection with the person with whom he desires to talk, that is the end of the transaction; he cannot talk with him at all. If two long-distance telephone companies have connections with the local central exchange, and one of these long-distance companies reaches the person to whom he desires to talk and the other does not, the subscriber can carry on his conversation; or there may be an intermediate connection between two different lines whereby the conversation is carried on. There is no embarrassment of physical bodies which have to be moved. There is no confusion or difficulty arising out of the character of the thing that is transported. There is no interchange of cars or of freight; there are no complicated car mileage or car trackage accounts. Simplicity instead of complexity is the ever-present feature of the transaction. Nothing is transported except an electric undulation, which reproduces at the farther end of the line the pulsations which are set into motion by the voice of the first speaker. There is no such condition as raises

a rule of necessity growing out of the kind of materials handled, which operate, as they might in the case of express companies, transfer companies, or sleeping car companies, to modify or qualify the entire freedom of use of these instrumentalities, by whomsoever presented to any railroad company. Conceivably, 20 long-distance telephone companies might be connected with a local exchange with the same simplicity and with the same absence of confusion which we find in relation to the local subscribers' lines, and there is no more physical difficulty, no more physical or other confusion, even in such a case as that, in connecting a subscriber with one of 20 long-distance telephone lines than in connecting the subscriber with another local subscriber served by the same exchange.

All of these observations are intended to illustrate the truth that the telephone business, in its practical operations, is to be distinguished from railroads, and even from telegraph companies, because the telegraphic message may be relayed and repeated before reaching its destination; while a conversation may be repeated, yet everybody knows that in common practice that is not telephoning at all, and such a method of communication between persons far distant from each other is practically unknown. One may, it is true, send a message to another to be repeated, but that is like a conversation that one tells another to repeat to a third person. That is rather telegraphing than telephoning. That is not the way in which conversation can be carried on, and the telephone is, above all things, a vehicle of conversation, of exchange of intelligible vocal expressions.

When it is said that a long-distance telephone company has no right to compel a connection with a local telephone exchange belonging to another company (which, of course, must be done, if at all, on reasonable and fair terms to the local company), for the same reason that one railroad company cannot be permitted to run its engines and cars loaded with its freight on the lines of another railroad company, no account is taken of the fact that the law as applied to railroad companies is a law arising out of convenience and necessity; for it would be physically impossible and unsafe for one railroad company to be permitted to run its cars and engines, except with the consent of the other company, over another company's lines. This is an obvious fact.

But in the reasoning whereby an analogy is sought to be shown between connecting telephone lines and connecting railroad lines in the respects referred to, no account is taken of the fact that originally, when railroads were first instituted, the theory upon which they were given the right of eminent domain was that the line of railroad was in truth and in fact in every respect a legal highway, and that in the primary conception of railroads it was intended that they should be used as highways—that any person might go upon them with his own locomotive and cars and operate them under reasonable restrictions. In the stupendous development of the physical facts of railroading, this theoretical and basic idea, that the railroad was a public highway in the large sense which I have described, disappeared.

If we could assume that the telephone business came into existence before the railroads, and the right of eminent domain was given to the telephone companies, as it is now given, and we had argued from that

point on the question as to the kind of a common carrier and the kind of a highway for vocal intelligible sounds, which were thus created, we would have found no occasion to say, and there would have been no suggestion, that it was impossible to conduct a telephone business on any such theory or plan as that on which we now know it is impossible to conduct the railroad business, and, if the telephone business had preceded the railroad business, instead of having an appeal made to keep the telephone business within the restricted limitations of correlation which we find between railroad companies, we would have found the law endeavoring to make the relations between connecting railroads as physically complete as they would have been and could easily have been between connecting telephone companies.

So that it seems to me not unlikely, in view of the manner in which the telephone is used, that, when the question squarely arises, it may be declared to be the law that when one long-distance telephone company presents itself to a community in which there is a local telephone exchange and proffers to that local company, by the simple mechanical arrangement necessary, connection with the rest of the world which is reached by the proffering long-distance company, public policy will say that the long-distance company is to be treated no differently than an individual in the community who requests the local company to give him a local telephone and the use of the local exchange upon terms which entitle him to it.

Second. But we have a very different situation where, as in this case, a local company, assuming that it cannot be compelled to make or permit a connection with a long-distance company, does in fact permit it. If the local company extends the use of its lines to long-distance service, does it make the long-distance service any the less of a public character than its local service? Assuming that it had a right to remain independent of and isolated from long-distance business, does it not give up that right of local independence and isolation when it takes on long-distance business? And if, in respect to long-distance business, it has granted the right of connection to one long-distance company, can it, either under the common law or the statutes of Ohio, deny to one long-distance company the right and privilege which it has granted to another? It seems to me that to put this question is to answer it. To this effect is Ohio ex rel. v. Telephone Company, 36 Ohio St. 296, 38 Am. Rep. 583.

The courts have had great difficulty in getting away from the proposition which I have suggested in the discussion under the head immediately preceding this. They have had difficulty in escaping the conclusion that a local company must permit connection to be made with other exchanges, whether it desires to do so or not. But they have found themselves compelled to come to the conclusion that where two companies have permitted a connection to be made between their exchanges, without having fixed by contract any period of termination, no disconnection of the systems can be permitted except such as arises out of the total retirement from business by one or the other company. State v. Cadwallader (Ind.) 87 N. E. 644.

And, coming now to the question of impartiality in the exercise of the rights and powers of a common carrier telephone company, the

situation which arises when a telephone company has permitted connections to be made with other exchanges, and thus has waived its primary right of independence, is discussed in the Cadwallader Case, supra. The court quotes from Allnutt v. Inglis, 12 East, 527, the following fundamental rule:

"Where private property is, by the consent of the owners, invested with a public interest, or privilege, for the benefit of the public, the owner can no longer deal with it as his private property only, but must hold it subject to the rights of the public, in the exercise of that public interest conferred for their benefit."

And also, from Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 77:

"Property does become clothed with a public interest when used in a manner to make it of public consequence and affect the community at large. When, therefore, one devotes his property to a use in which the public has an interest, he, in effect, grants to the public an interest in that use, and must submit to be controlled by the public for the common good, to the extent of the interest he has thus created. He may withdraw his grant by discontinuing the use; but, so long as he maintains the use, he must submit to the control."

After discussing the situation in the light of the general principles just quoted, the court lays down the rule, as shown by the eleventh syllabus, as follows:

"Where a physical connection between telephone systems owned by different persons is voluntarily made, and the public thereby acquires an interest in the continuance thereof. the act of the persons in making such connection is equivalent to a declaration of a purpose to waive the primary right of independence, and it imposes on the property such a public status that it may not be disregarded."

Following this, the court discusses a question directly involved here, and comes to the inevitable conclusion which the situation there and here demands. On page 652 of 87 N. E. is the following:

"Having elected to furnish direct physical connection between, and immediate communication to and for, other exchanges and their patrons through his exchange in West Lebanon, he cannot exclude a like service to an exchange in the same town, for the reason that he is compelled to treat all of the same class alike, and there can, it seems to us, be no rational ground for excluding one exchange when others are admitted. The act of admitting the connection alleged is equivalent to a declaration that all will be admitted to the connection on the terms and conditions imposed as to one or more. Appellee has admitted to his exchange the exchanges of Ambia, Boswell, Williamsport, and Danville. Not only the patrons of appellant's plant, but those of appellee, the public at large, have an interest in the matter. Appellee could have refused to connect his plant and to furnish direct or immediate service to appellant's patrons and to other exchanges and their patrons, but did not so refuse; but he and they opened their exchanges to all applicants. Could it be insisted, other things being equal, that appellee could refuse connections from Ambia and accept those from Boswell? We take notice as a matter of science that the connection with the other towns and with appellee's patrons is made through a device known as a 'switch' in West Lebanon, so that the conditions of connection are the same and in numerous cases it has been held, with reference to telegraph lines, that, if service is furnished to one, another in the same town or city is entitled to the same service, not upon the ground of a primary right, but because, having elected to furnish the service to one, the same obligation arises in favor of all others like situated." (Citing authorities.)

The proposition involved in this last quotation is laid down in syllabus No. 16, as follows:

"Where an operator of a telephone system furnished connected immediate service to separate exchanges and their patrons, but denied such service to another exchange and its patrons of the same class, the operator discriminated against the latter in violation of the common law and of the statute of Indiana, requiring telephone companies to supply applicants impartially."

I find myself profoundly impressed with the soundness of the conclusion just quoted, and, indeed, I can conceive of no plausible argument against it. The telephone company is a public servant and is a common carrier of news, as the Indiana Supreme Court puts it. It cannot enter into a contract which tends to create a monopoly; and it cannot deny to one person the rights and privileges which it grants to other persons similarly situated.

This contract in question does tend to create a monopoly, in that it refuses to the subscribers to the local company any opportunity through the local exchange for competitive service; and the local company ceases to be a common carrier, devoted to a public use, offering the same terms, opportunities, and privileges to all persons similarly situated, in that it undertakes to give to the complainant what it denies to the defendant.

The position which counsel for complainant take comes to this when we analyze it: The Bell Telephone Company is a wicked monopoly. Some years ago the United States Company concluded to fight it. The only way to fight the Devil was with fire. The only way to fight the monopoly was to monopolize all unoccupied territory. The way to monopolize this unoccupied territory was to go to a local telephone company which had no long-distance connection and offer to give it such long-distance connection, provided a perpetual monopoly of it was given in return.

This purpose to destroy the Bell monopoly may be admitted to be virtuous. The method resorted to was vicious. It was a mere repetition and imitation of the methods which, when followed by the Bell Company, are so bitterly denounced. The philosophy that the end justifies the means, when the end is virtuous and the means vicious, has long since been discarded, if it ever had any avowed supporter. But even that philosophy cannot apply to a mere business undertaking. The purpose to destroy the telephone monopoly was not a virtuous purpose; it was a business proposition, which incidentally led, we may assume, to a righteous result. What becomes of the righteous result when the means to accomplish it are the means of unrighteousness? The ultimate result of which may be that we discover we have exchanged one master for another, or, if not, that we have emphasized the strength of the former master. Counsel, of course, will not deny that, if the Bell Company should acquire control of the complainant, these contracts would be just as valid, and the shield of our defense would be turned into a weapon with which to destroy us.

Are the court to turn themselves into inquisitors of the minds of men and say:

"Here is a man who wants to do the world some good. The ultimate result promises to be beneficial, but, in order to accomplish it, he must monopolize the business of some community and must violate the law. May he do so?"

These questions were long ago answered, yet they come up again and again.

The sum of it all is that it does no good to destroy one monopoly by creating another. Monopolies all look alike to the law. When they use their power unlawfully, it is for the law to take suitable steps to punish the offender and prevent recurrence of the offense. Take the concrete case before us. A small community has established a local telephone service; it wants a long-distance service; it contracts with a long-distance company that, if it will connect with the local company's line, it will not for 99 years permit any other long-distance company to make any such connection. There is no physical difficulty which interferes with more than one connection. The community, unless it starts a new exchange, for which it has no local use, is denied the right both to have competition and to have telephone connection with places and persons not connected with the lines of the long-distance company. This is, as I view it, against public policy, because it both tends to create a monopoly and denies to persons similarly situated the same privileges accorded to others. The situation would, I suspect, appear less complicated if the conditions were reversed and the attack was being made on a similar contract made by the Bell Company.

It follows that the complainant is not entitled to an injunction, and an order may be made accordingly.