BY THE

## ST. LOUIS, KANSAS CITY AND SPRINGFIELD

# COURTS OF APPEALS

AT THE

## MARCH TERM, 1910.

HOME TELEPHONE COMPANY, Appellant, v. GRANBY & NEOSHO TELEPHONE COMPANY, Respondent.

### St. Louis Court of Appeals, March 8, 1910.

1. **TELEPHONE COMPANIES: Duty to Furnish Service: Common Law Obligation.** Even though telephone companies are not common carriers in the sense that they are insurers, they are under obligation to furnish impartial service to any one offering to comply with their reasonable requirements.

2. ———: ———: **Statute.** Section 1255, Revised Statutes 1899, imposes the obligation on telephone companies operating in this State to act impartially and in good faith with respect to others.

3. **COMMON CARRIERS: Duty to Transport: Telegraph Companies.** In the absence of a statute or contract so providing, a common carrier cannot be compelled to do more than receive and transport or transmit to the end of its own line and deliver to a connecting carrier with reasonable promptness; and this much and no more has been enforced as the entire obligation of telegraph companies.

4. ———: **Involuntary Use of Instrumentalities by Rival Concern.** Common carriers cannot be required, on the assertion of a primary duty in the first instance, to turn over the physical use of their instrumentalities to a rival concern.

147 App.]                    (216)

Telephone Co. v. Telephone Co.

5. **RAILROADS: Granting Exclusive Privilege.** At common law, a railroad may not grant an exclusive privilege to a connecting common carrier that operates as an unjust discrimination against others in the same .class in respect of equal facilities for interchanging business.

6. **TELEPHONE COMPANIES: Duty to Receive Business from Other Companies: Statute.** Section 1255, Revised Statutes 1899, imposes the duty upon all telephone companies within its terms to receive business from other telephone companies.

7. ——: **Corporations: Public Service: Interest of Public.** A corporation by entering into the business of furnishing the public with telephone service invests the public with an interest, to which its private property rights are subject, both on account of the public use and the enjoyment of the special prerogatives of corporate existence.

8. ——: **Operation by Individual: Rights of Public.** Although the person conducting a general telephone business is a natural person, the use to which he has seen fit to devote his private property impresses the same with a public interest sufficient to sustain the right of others engaged in that business to enforce a physical connection with his exchange, if he has given that privilege to others, to the end that no unjust discrimination should be had in serving all of the same class.

9. ——: **Connecting with Other Companies: Granting Exclusive Privilege: Contract Void.** A contract between two telephone companies, by which each granted the other the privilege to connect with their respective exchanges, and each agreed to transmit all messages destined to points on the lines of the other, which were not reached by its own wires, over the lines of the other, and further agreed not to enter into any contract with any other person or corporation whereby any of the rights or advantages therein acquired by either party might be impaired raises an obligation on the part of said companies to grant the same right of connection and privilege of transmitting messages to other telephone companies, and the provisions therein contained which undertook to grant exclusive advantages and privileges are, therefore, void.

**CONTRACTS: Void: Enjoining Breach.** An injunction will not lie to restrain the breaching of a void contract.

11. **TELEPHONE COMPANIES: Right of Patron to Select Connecting Line: Common Law: Statute.** Both at common law and under section 1256, Revised Statutes 1899, a person sending a telephone message has the right to direct by what connecting lines it shall be transmitted, and it is the duty of the

initial company to forward the message over the lines thus selected, provided the facilities for transmitting the message over them are within the limits of the usual delivery of the initial company.

12. ———: ———: ———: ———: Granting Exclusive Connecting Privilege: Contract Void. A contract between two telephone companies, in which it is stipulated that all messages arising on the lines of either of the companies, destined to points on lines of the other not reached by its own lines, shall be transmitted over the lines of the other, is void as violating both the statutory and common law right of the sender of a message to select the connecting carrier to transmit the message beyond the lines of the initial carrier.

13. ———: Contract Granting Exclusive Connecting Privilege: Not Authorized by Statute. Sections 1254 and 1255, Revised Statutes 1899 are *in pari materia,* and must be read and interpreted together. Thus construed, section 1254, which authorizes telephone companies to join in using their lines, does not authorize the making of a contract between two telephone companies, granting mutual exclusive connecting privileges.

14. UNLAWFUL COMBINATIONS: Section 8978: Liberally Construed. Section 8978, Revised Statutes 1899, is in aid of the common law and should not, therefore, be strictly construed.

15. TELEPHONE COMPANIES: Unlawful Combinations: Statute: Telephone Service is "Commodity." Where two telephone companies enter into a contract to transmit over their respective lines messages originating on the lines of the other, the telephone service thus provided for is a "convenience or commodity," within the meaning of section 8978, Revised Statutes 1899.

16. ———: ———: Contract Granting Exclusive Connecting Privilege: Statute. A contract between two telephone companies, which gave each the exclusive right to have transmitted over its lines all messages coming from the lines of the other destined to points on the lines of the connecting company not reached by the lines of the other company, and which provided that the connecting carrier should receive for its service a percentage of the charge made, to be determined on the basis of the relative number of miles the message was transmitted on their respective lines, is void, under section 8978, Revised Statutes 1899, as prohibiting the parties thereto from buying such service as to messages, destined to points on the lines of the other, from other companies, and attempting to create a monopoly as to such business.

Dissenting Opinion by Reynolds, P. J.

17. ———: ———: ———: ———. Such a contract does not hinder any other company from carrying on and competing for business and does not create a monopoly.

18. ———: ———: Statute Directed Against What Agreements. It is against such agreements as prevent others from using the facilities of the contracting parties to as full an extent as other customers might use them that the anti-trust statute is aimed, which the contract in question does not do.

19. ———: Duty to Receive Business from Other Companies. A telephone company is bound to allow another telephone company to have access to its lines and connection with its subscribers, just as it is bound to allow like privileges to any other citizen.

20. ———: Connecting with Other Companies: Granting Exclusive Privilege: Contract not Void. A contract between two telephone companies, by which each granted the other the privilege to connect with their respective exchanges and each agreed to transmit all messages destined to points on the lines of the other, which were not reached by its own wires, over the lines of the other, and further agreed not to enter into any contract with any other person or corporation whereby any of the rights or advantages therein acquired by either party might be impaired, does not raise an obligation on the part of said companies to grant the same rights and privileges to other telephone companies—in other words, the right to become part of the system of said contracting companies. Said contract is valid and violates no law, common or statutory, and the installation by one of the contracting companies of an exchange for another telephone company in connection with its own exchange and taking said company in on its business as a joint operator of its system would be violative of the rights of the other contracting company under said contract.

21. ———: ———: ———: ———: Constitutional Rights. A construction of the statutes relative to telephone companies, which would compel one company to subject all its facilities to the use of a third party merely because it had made a contract letting another enjoy them, would violate the constitutional guarantee of protection in the use and enjoyment of one's own property.

22. ———: Are Common Carriers to What Extent: Public Service Corporations: Right·to Contract. Telephone and telegraph companies are carriers *sub modo* only, and while they may aptly be called "public service corporations," this does not destroy their right of property or contract.

Appeal from Newton Circuit Court.—*Hon. F. C. Johnston,* Judge.

AFFIRMED.

*McReynolds & Halliburton* for appellant.

(1) The contract between plaintiff and defendant is specially authorized by the Statutes of Missouri. R. S. 1899, sec. 1254. (2) The contract between plaintiff and defendant is not invalid as being in restraint of trade, monopolistic or in violation of chapter 143, Revised Statutes of Missouri, 1899. The restraint (if any) is partial and the restriction reasonable, and such as affords a fair protection to the parties and is not so large as to interfere with the general public. Skrainks v. Scharringhauser, 8 Mo. App. 522; Long v. Toll, 42 Mo. 545; Wiggins Ferry Co. v. Railroad Co., 73 Mo. 389; Wiggins Ferry Co. v. Railroad, 116 U. S. 615; Finck v. Granite Co., 187 Mo. 269. (3) A contract limited as to time and space is valid, and a contract unlimited as to time but limited as to space is valid, and not so in restraint of trade as to mark it void. 9 Cyc., p. 525, par. C and pp. 527, 529, 530, 531; Telegraph Co. v. Tel. Co., 5 Ohio Dec. (Reprint) 407; affirmed 7 Birs. (U. S.) 367; 29 Fed. Cas. No. 17445; Richmond v. Railroad, 33 Iowa 422; Conn. v. Delaware, etc., Canal Co., 43 Pa. St. 295; Brown v. Railroad, 75 Hun (N. Y.) 355; 27 N. Y. Supp. 69, 56 N. Y. St. 748. (4) The finding of the court that defendant had not violated the contract is in the teeth of the evidence. A cursory glance at the evidence will satisfy this court that defendant had violated the contract. (5) An examination of the evidence will show the court that instead of the contract being in restraint of trade, so far as defendant is concerned, that it doubled defendant's capacity, give it double the number of phone subscribers in the territory reached by the wires of plaintiff and Bell companies, and give defendant additional territory

not reached by the Bell company. (6) The court has the right and power to specifically enforce the contract between plaintiff and defendant. Railroad v. Railroad, 144 N. Y. 152, 26 L. R. A. 610; Telegraph Co. v. Harrison, 145 U. S. 549, 36 L. Ed. 776; Telegraph Co. v. Pennsylvania Co., 129 Fed. 849, 68 L. R. A. 968; Standard Fashion Co. v. Siegel-Cooper Co., 157 N. Y. 60, 68 Am. St. 749; Joy v. Railroad, 138 U. S. 1, 34 L. Ed. 843. (7) A court of equity will grant injunction to protect contract right, and it is not necessary that injury should be irreparable and defendant insolvent. Brewing Co. v. Waterworks Co., 34 Mo. App. 49; Gordon v. Mayfield, 84 Mo. App. 367; Musser v. Brink, 80 Mo. 350; Jones v. Williams, 139 Mo. 1; Tool Co. v. Spring Co., 93 Mo. App. 530.

*O. L. Cravens* for respondent.

(1) This contract is void at common law governing monopolies in restraint of trade. Slaughter v. Thacker C. C. Co., 55 W. Va. 642; 2 Am. and Eng. Ann. Cas., 335, and note, 336; Fox Co. v. Scoen, 77 Fed. 29; Harrow Co. v. Quick, 67 Fed. 130. (2) A contract between two public service corporations, supplying the same community with a public commodity and service, cannot legally contract to give each the exclusive right to sell such commodity and service in a specified portion of the territory, and binding one of the corporations to use no other of such commodity and service for its patrons than that produced by the other corporation, and to refrain from producing that commodity in the producing territory of such other corporation, was held totally void and unenforcible, as it tends to create a monopoly and is therefore contrary to public policy. Nat. Gas Co. v. Nat. Gas & Fuel Co., 58 W. Va. 22, 6 Am. and Eng. Cas., 154, and note 157; Gas. Co. v. Gas. Co., 121 Ill. 530; State ex rel. v. Portland Gas Co., 153 Ind. 483; Railroad v. Closser, 126

Ind. 348. (3) Similar in principle to the case we have here is that line of decisions holding void as against public policy contracts of railroads and telegraph companies, giving the latter the exclusive right to use and occupy the right of way of the former for telegraph purposes. Western Union v. Am. Union, 65 Ga. 160; Tel. Co. v. Western Union, 23 Fed. 319; Western Union v. Railroad, 11 Fed. 7; Pullman Co. v. Railroad, 11 Fed. 625. (4) There being a penalty provided by sections 1255 and 1256 for violation of their requirements, and this contract being contrary thereto in its letter and spirit, renders it void as though expressly prohibited and thereby declared void. 15 Am. and Eng. Ency. Law (2 Ed.), 939; Tri-State A. Co. v. Amusement Co., 192 Mo. 423; Friend v. Porter, 50 Mo. App. 89. (5) This contract is also illegal because it violates the anti-trust laws, chapter 143, R. S. Section 8966 prohibits the making of a contract made with a view to lessen or which tends to lessen, full and free competition in the sale of any article or commodity in this State, and declares such contracts void. A commodity has been defined as meaning "privilege, profit, gains." Bank v. Apthrop, 12 Mass. 252; Minot v. Winthrop, 162 Mass. 113; Anderson's Law Dic., 211; 8 Cyc. 338; 6 Am. and Eng. Ency. Law (2 Ed.), 230.

NORTONI, J.—This is a suit in equity. Plaintiff seeks to enjoin further breaches of a contract between it and the defendant. Upon a hearing, the court dismissed the bill and plaintiff prosecutes the appeal. There is no question presented as to the form of the remedy pursued and that matter will remain unnoticed. Both plaintiff and defendant are telephone companies incorporated and existing under the laws of this State. The plaintiff, Home Telephone Company, maintains offices and telephone exchanges at Joplin, Carthage, Carterville and other points in southwest Missouri and southeast Kansas. The defendant, Granby & Neosho

Telephone Company, owns and operates a telephone line from Granby to Neosho and maintains its offices and an exchange in each of those cities. Both companies, desiring to extend their business, entered into an arrangement in writing whereby they agreed to transmit messages over their lines destined to points in the territory occupied by the other company. Among other things therein stipulated, this contract required the plaintiff company to construct a connecting line from the city of Carthage to the city of Granby, a distance of about twenty miles, and connect the same with the defendant's exchange at the latter point. Partly in consideration of this contemplated connection by the extension of plaintiff's lines from Carthage to Granby, it was further provided in section four of the contract that each of the telephone companies agreed to transmit all messages destined to points in the territory of the other company, not reached by its own system of wires, to and over the lines of the other party. It was also stipulated that neither party would enter into any contract with any other person, firm or corporation whereby any of the rights, privileges or advantages therein assured should be impaired. By its terms the contract was to continue for a period of twenty-five years. It assured to each company an exclusive privilege of physical connection with the exchange of the other and assured as well an exclusive privilege to each company to transmit over its lines all messages originating or passing over the lines of the other destined to points not reached by the initial carrier and which were reached by the lines of the connecting company. The companies assumed mutual obligations with respect to transmitting the messages of the other and each agreed to at all times keep the lines and connections in proper repair for the use of the other. A further provision is made in subsequent portions of the instrument with respect to the division of the compensation received for transmitting the messages over the respective lines

therein contemplated. The two sections of the contract which are relevant to this controversy are as follows:

"Second: Each party hereto grants a license to the other party to connect with the telephone exchange or system of the other party, through its switchboard at Carthage and Joplin and Granby, so that an interchange of business may at all times be carried on between said parties. Said connections to be made as soon as the lines are completed, it being understood and agreed that the line of both parties hereto shall be so operated that service may be given from all lines owned, controlled or connected with the line or lines of either of the parties hereto over the lines of the other and its connections. And each party hereto agrees not to enter into any contract with any other person, firm or corporation whereby any of the rights, privileges or advantages herein acquired by either party may be impaired.

"Fourth: Each party agrees to transmit all messages destined to points on the lines of the other party hereto not reached by its own system of wires, to and over the lines owned and controlled by the other party. In consideration of the benefits to be derived by each of the parties hereto from the toll service herein provided to be furnished by each, each party agrees to transmit all business to points reached by its own line or lines, and those to be constructed or acquired over the lines of the parties hereto."

It appears the plaintiff constructed the telephone line from Carthage to Granby, as required, and that the two systems were connected thereby. A physical connection of the lines was established under the contract by means of a switchboard in the defendant's exchange at Granby with the new line constructed thereto from Carthage by the plaintiff. For a considerable period the parties operated under this contract without any disagreement whatever, and it appears that at all times plaintiff faithfully transmitted all messages received

by its lines and destined to points on the lines of the defendant company, which were not reached by the lines of plaintiff, to and over the lines of defendant company. For a time, the defendant did likewise; that is to say, it transmitted all messages originating on its lines destined to points on the lines of the plaintiff company, which were not reached by the wires of defendant, to and over the lines of the plaintiff company to the point of destination. It appears, however, that after this arrangement had been in force and carried out for some time, the Missouri & Kansas Telephone Company, commonly known as the Bell System, interposed and refused to have certain business relations with the defendant, Granby & Neosho Telephone Company, unless that company would accord it equal privileges with the plaintiff, Home Telephone Company. In view of this, the defendant company acceded to the demands of the Missouri & Kansas Company to the extent of transmitting such messages as were received by it destined to points on the lines of both plaintiff company and the Missouri & Kansas Company, which were not reached by the wires of the defendant and at which points the Missouri & Kansas Company maintained individual telephones in offices or residences for patrons. The defendant company also permitted the Missouri & Kansas Telephone Company to enter its exchange at Granby and accorded it a physical connection with its lines by means of a switchboard, for the purpose of affording it equal facilities with the plaintiff, Home Telephone Company. Of course, this operated to violate the stipulations contained in the contract between the plaintiff and defendant to the effect that all messages received by defendant, destined to points on the lines of the plaintiff, not reached by the wires of defendant, should be transmitted by it over plaintiff's lines, and it operated also to violate the provision of the contract with respect to assuring the plaintiff an exclusive

147 App—15

right to a physical connection with the defendant's exchange at Granby. After having failed to induce the defendant to abide the stipulations vouchsafing the exclusive privileges mentioned, the plaintiff company instituted this proceeding to the end of enjoining further breaches of the contract. As before stated, the circuit court dismissed the bill on the grounds that in its opinion the contract was void as against public policy and therefore unenforcible.

Plaintiff prosecutes an appeal from that judgment and argues that the contract is a valid arrangement between the parties for the reason that it amounts to no more than an arrangement between connecting carriers whereby each selects the agency to forward initial business originating on its lines and thus enlarges the scope of a beneficial use. And it is said, as each telephone company enjoys the right which inheres in the ownership of property to control its own instrumentalities, no right of a physical connection with the exchange of either obtains in favor of any other person or company against the consent of the owner. The argument is that as the Missouri & Kansas Telephone Company could not enforce a physical connection with the exchanges of either the plaintiff or defendant contrary to the consent of the owner, then the stipulation in the contract affording an exclusive privilege to such physical connection as between plaintiff and defendant violates no rights of a third party. It is argued, too, that neither of the contracting telephone companies is under any obligation whatever with respect to the transmission of telephone messages after such messages leave their own lines. In other words, it is insisted that the obligation of the carrier goes only to the extent of carrying the message over its own lines and to deliver to the connecting carrier with reasonable promptness, and that, in view of this, each initial carrier may, in the absence of directions to the contrary, select the particular agency to be employed as a connecting carrier for

one or all of the messages it becomes the duty of the initial carrier to forward. Abstractly speaking, the propositions of law put forward in the arguments suggested may be sound but they must be treated with and applied in conjunction with other relevant principles which are invoked as well by the particular facts of the case.

Even though telephone companies are not common carriers in the sense essential to render them amenable under the obligations of an insurer (27 Am. and Eng. Ency. Law [2 Ed.], 1021; Jones on Telephones, sec. 243; State ex rel. v. St. Louis, 145 Mo. 551, 46 S. W. 981), there nevertheless arises from the voluntary undertaking to serve the public in their chosen capacity at least one obligation incident to the relation of a common carrier. This obligation the common law annexes to the use of their instrumentalities, which operates to affix the duty upon such companies of furnishing impartial services to any one offering to comply with their reasonable requirements, not only in respect to their public station system but also as to the private use of instruments installed in offices, residences and places of business. The obligation arising from the use is to furnish each and all equal facilities for communication without unjust discrimination, unless the privilege is sought for an illegal or immoral purpose. Authorities affirming the doctrine are numerous. [State ex rel. v. Kinloch Telephone Co., 93 Mo. App. 349, 67 S. W. 684; State ex rel. v. Cadwallader (Ind. Sup.) 87 N. E. 644; State ex rel. Webster v. Nebraska Telephone Company, 17 Neb. 126; State ex rel. Gwynn v. Citizens' Telephone Co., 61 s. c. 83; State ex rel. B. & O. Telegraph Co. v. Bell Telephone Co., 23 Fed. 539; s. c., 8 Am. & Eng. Corporation Cases, 7; State ex rel. Postal Telegraph Company v. Delaware & A. Telegraph & Telephone Co., 47 Fed. 633; Delaware & A. Telegraph & Telephone Co. v. State ex rel. Postal Telegraph Co., 50 Fed. 677; State ex rel. American Union Telegraph Co., etc. v. Bell Tele-

phone Co., etc., 36 O. 296; People ex rel. v. Hudson River Tel. Co., 19 Abb. (N. Y.) 466; Chesapeake, etc., Telephone Co. v. B. & O. Telephone Co., 66 Md. 399; Bell Telephone Co. v. Commonwealth ex rel. B. & O. Telephone Co., 3 Central Rep. 907; Hockett v. State, 105 Ind. 250; Central Union Telephone Co. v. Bradbury, 106 Ind. 1; Central Union Telephone Co. v. State ex rel. Falley, 118 Ind. 194; Central Union Telephone Co. v. State ex rel. Hopper, 123 Ind. 113; Bell Telephone Co. v. Commonwealth, 3 Atl. 829; Telegraph Company v. Telephone Co., 17 Atl. 1071; State ex rel. American Union Telegraph Co. v. Telephone Co., 22 Albany Law Journal, 363; United States Telephone Co. v. Central Union Telephone Co., 171 Fed. 130; State ex rel. v. Bell Telephone Co., 11 Central Law Journal, 359; s. c. 22 Albany Law Journal 363; 27 Am. & Eng. Ency. Law (2 Ed.), 1021; Jones on Telephones, sec. 243, *et seq.*]

In keeping with this doctrine the courts have, under varying circumstances, denied the right of telephone companies to withhold from one person the privilege accorded to another and forced such companies to install telephones for the use of a proposed private patron upon his paying the price and complying with the reasonable rules of the company, to the end that no discrimination may be allowed. Such were the cases of State ex rel. v. Kinloch Telephone Co., 93 Mo. App. 349, 67 S. W. 684; State ex rel. v. Nebraska Telephone Co., 17 Neb. 126; State ex rel. Gwynn v. Citizens' Telephone Co., 61 s. c. 83 and several other among those above cited. The principle has been applied and enforced, too, with respect to the rights of other telephone and telegraph companies, notwithstanding the fact that such companies were competitors or rivals in the same business. The doctrine of those cases is to the effect that even though a rival telegraph or telephone company might not in the first instance have the right to compel the use of another company's appliances and service, such right accrues upon the one company according the

same to another of the same class engaged in like busi-
ness.  In the case of State of Missouri ex rel. B. & O.
Telegraph Co. v. Bell Telephone Co., 23 Fed. 539, s. c.,
8 Am. and Eng. Corporation Cases, 7, it appeared that
the telephone company had established a business con-
nection with the Western Union Telegraph Company by
means of installing its telephone in the Western Union
offices and denied the same right to the Baltimore &
Ohio Telegraph Company.  Justice BREWER conceded
the right of the telephone company in the first instance
to deny the use of its instrumentalities to its competitor
or business rival but said that inasmuch as it had estab-
lished such a connection and afforded the use of its ap-
pliances to the Western Union Telegraph Company, it
thereby assumed the obligation to render like service, on
equal terms, to all of the same class.  The learned judge
said:

"I agree that if this telephonic system had refused
a telephonic connection with any telegraph company,
that the Baltimore & Ohio Telegraph Company could
not insist upon such connection, but when it has es-
tablished telephonic connection with one telegraph com-
pany, I think every other telegraph company has equal
right; on the same principle that if it established a tele-
phonic connection with one lawyer, it could not refuse
telephonic connection with another lawyer."

The same situation was presented in State ex rel.
Postal Telegraph Co. v. Delaware & A. Telephone Co.,
47 Fed. 633.  In that case the telephone company had
established business relations with the Western Union
Telegraph Company and afforded it facilities for tele-
phonic communication by installing a telephone in the
Western Union office.  The telephone company denied
the same right to the Postal Telegraph Company.  The
Circuit Court of the United States enforced the right
of the Postal Telegraph Company by mandamus and
said that as the telephone company had selected the tele-
graph as one of the classes it was willing to serve, all of

the same class should be afforded equal facilities and without discrimination. The judgment in this case was affirmed by the United States Circuit Court of Appeals, Third Circuit, as will appear by reference to Delaware & A. Telephone Co. v. State ex rel. Postal Telegraph Co., 50 Fed. 677. To the same effect is People ex rel. v. Hudson River Telephone Co., 19 Abb. (N. Y.) 466. In that case the telephone company had established a business relation with and installed telephones for the use of the Western Union Telegraph Company and denied the identical right to the Postal Telegraph Company. The court declared that as the right had been accorded to the Western Union Telegraph Company an obligation thereby arose out of the nature of the business to accord the same right to the Postal Telegraph Company and this, too, notwithstanding the fact that both the defendant telephone company and the Postal Telegraph Company were engaged as competitors in a messenger service. So much of the telephone company's rule forbidding the use of its telephone by the Postal Telegraph Company for the purpose of calling messengers and thus employing its appliance in competition with it in the messenger service was declared without force. To the effect that a telephone company may not afford the use of its connection and appliances to one telegraph company and unjustly discriminate by denying the same to another, see also State ex rel. American Union Telegraph Co. v. Bell Telephone Co., 11 Central Law Journal, 359; s. c., 22 Albany Law Journal, 363. For an instructive case declaring the identical doctrine above referred to, see Commercial Union Telegraph Co. v. New England Telephone Co. (Vt.), 5 L. R. A. 161 and notes.

The judgment given in each of the cases above referred to proceeds in affirmance of the obligation enjoined by the principles of the common law. Other courts have ruled to the same effect by commingling the common law principles with statutory obligations imposed. It is said that both under the common law and the statu-

tes one telephone company may not accord the right of a physical connection with its exchanges by another telephone company and deny the same to others of the same class. Such exclusive contracts are declared to be against public policy and void both at common law and under the statutes. [State ex rel. Goodwine v. Cadwallader (Ind. Sup.), 87 N. E. 644; United States Telephone Co. v. Central Union Telephone Co., 171 Fed. 130.]

Aside from the common law obligation above referred to, our statutes impose the obligation on telephone companies operating in this State to act impartially and in good faith with respect to others. The statute is as follows:

"It shall be the duty of every telegraph or telephone company, incorporated or unincorporated, operating any telephone or telegraph line in this State, to provide sufficient facilities at all its offices for the dispatch of the business of the public, to receive dispatches from and for other telephone or telegraph lines, and from or for any individual, and on payment or tender of their usual charges for transmitting dispatches, as established by the rules and regulations of such telephone or telegraph line, to transmit the same promptly and with impartiality and good faith, under a penalty of two hundred dollars for every neglect or refusal so to do, to be recovered, with costs of suit, by civil action, by the person or persons or company sending or desiring to send such dispatch, one-half of the amount recovered to be retained by the plaintiff, and one-half to be paid into the county public school fund of the county in which the suit was instituted; and the burden of proof shall be upon the company to show that the wire was engaged as the reason for the delay in transmitting such dispatch." [Sec. 1255, R. S. 1899, sec. 1255, Ann. St.] The courts have held generally that statutes such as ours above quoted are merely declaratory of the common law obligations. See Davis v. Western Union Telegraph

Co., 1 Cinc. Super. Ct. Reporter 100; s. c., Allen's Tel. Cas. 363; De Rutte v. N. Y. Alb. & Buff. Tel. Co., 1 Daly (N. Y.) 547; Western Union Tel. Co. v. Reynolds, 77 Va. 173; Western U. Tel. Co. v. Graham, 1. Colo. 230; Tyler v. Union Tel. Co., 60 Ill. 421; s. c. (on App.), 74 Ill. 168; G. C. & S. F. R. R. v. Levy, 59 Tex. 542; Telegraph Co. v. Griswold, 37 Ohio 301; Western Union Tel. Co. v. Neill, 57 Tex. 283; Wolf v. Western Union Tel. Co., 62 Pa. St. 83; Passmore v. Western Union Tel. Co., 78 Pa. St. 238; N. Y. & Wash. Pr. Tel. Co. v. Dryburg, 35 Pa. St. 298; Dorgan v. Telegraph Co. (C. C. S. D. Ala. 1874), 1 Am. L. T. Rep. (N. S.) 406; Turnpike Co. v. News Co., 43 N. J. Law, 381.

Under the statute of Ohio, in all respects material here identical with our own, the Supreme Court of that state declared that, independent of the common law, the statute quoted imposed the obligation upon a telephone company affording a business connection to one telegraph company to grant the same with impartiality to all others. In that case, the telephone company, as in many others above referred to, was the licensee of the American Bell Telephone Company which owned the telephone patent and was operating its telephone line under a contract with the owner of the patent to the effect that it should afford the Western Union Tel. Co. an exclusive right to transmit messages over its lines. This contract, in this respect, is similar to the one in judgment now before us. The Supreme Court declared the contract void as violative of the statute above referred to in that it purported to authorize the giving of one telegraph company an exclusive right to employ the telephone; that in so doing, it operated an unjust discrimination against other telegraph companies employed in the same service. The court said the telephone company "cannot be permitted to operate a line or system of telephones, in this State, and in the face of the statute, either directly or through the agency of licensees without impartiality, or in other words, with dis-

crimination against any member of the general public who is willing and ready to comply with the conditions imposed upon all other patrons or customers who are in like circumstances." See State ex rel. v. Bell Tel. Co., 36 O. 296. The Supreme Court of Maryland declared the same with respect to a like contract whereby the owner of the patents inhibited the local telephone company from permitting the use of the telephones by any other telegraph company than the one therein mentioned. The court declared that the statute referred to imposed the obligation of impartial service to all persons alike and that the inhibition of the patentee contained in the license or contract with the local telephone company forbidding the employment of the telephones in the service of any company, other than the Western Union Telegraph Company, was void as against the public policy of the state declared by the statute, for the reason it operated an unjust discrimination against other telegraph companies. The doctrine is that if the telephone company sees fit to voluntarily afford facilities to one telegraph company, it must afford the same to all others of the same class who apply on like terms. And this is true notwithstanding the parties may be business rivals. See Chesapeake & Potomac Telephone Co. v. Baltimore & Ohio Telegraph Co., 66 Md. 399.

But it is argued first that the law does not impose the obligation even upon a common carrier, such as railroads, to transport beyond the limits of their own lines, and, second, that such institutions as railroads, which are universally declared to be common carriers for all, may refuse to accord a rival the physical use of its instrumentalities. We believe it is true as a general proposition that in the absence of contract or statute to that effect, a common carrier may not be compelled to do more than receive and transport or transmit to the end of its own line and deliver to the connecting carrier with reasonable promptness, and this much and no more has been enforced as the entire obligation of telegraph

companies. [United States Telegraph Co. v. Western U. Co., 56 Barb. (N. Y.) 46; Baldwin v. United States Telegraph Co., 6 Abb. Pr., N. S. (N. Y.) 405.] It is the law, too, without doubt, that common carriers may not be required, on the assertion of a primary duty in the first instance, to turn over or surrender the physical use of their instrumentalities to a rival concern. The principle on which the courts have given judgments of immunity in such circumstances is that relating to the prerogatives which inhere in the ownership of property. On this principle it is declared that common carriers, like other persons, enjoy the right to an exclusive control and use of their instrumentalities as against a rival, notwithstanding the public concern in their business. Among others, the Express Cases, 117 U. S. 1, are authority for this proposition. See also Jencks v. Coleman, 2 Hun Rep. 221; Barney v. Oyster Bay, etc., Steamboat Co., 67 N. Y. 301; Shelbyville R. R. Co. v. Louisville, etc., R. R. Co., 82 Ky. 541; L. & N. R. R. v. Central Stockyards Co., 29 Sup. Ct. Rep. 246. The case of Lake Superior, etc., R. R. Co. v. A. T. & S. F. R. R. Co., 93 U. S. 442 is also instructive.

However, this doctrine touching the right of common carriers to an exclusive control of their instrumentalities, notwithstanding the public interest, arises largely from consideration of public policy influenced to a more or less extensive degree by the very necessities of the calling.

It is sufficient to suggest that no one can foresee or foretell the possibilities for interminable confusion, and extraordinary dangers which would attend the promiscuous use of the tracks, terminals and instrumentalities of one railroad by another without consent.

It is said that the identical doctrine obtains with respect to the right of one telephone company to enforce the physical use of the exchange of another to the end of connecting with its lines. This may be true but it is certain that although the obligations of the railroad

and the telephone company are similar, the duty of each when considered with reference to the means employed to discharge it, is not in all respects the same. In the first place, it is the duty of the railroad to transport for its patron, in its own way, on its own conveyances, and to deliver to the connecting carrier. In thus discharging its obligation, the railroad company retains possession, operates and manages the instrumentalities by which the transportation is had. It is not so with the telephone. The act of telephoning is the act of holding a conversation with another over the wires of the telephone company. The conversation, instead of being delivered to the agency of the telephone company, as are the goods to the agents of the railroad or the dispatch to the agent of the telegraph company for transmission, is transmitted by the patron of the telephone himself, by means of electrical undulations which reproduce at the farther end of the line the pulsations set in motion by the first speaker. The act of transmission is instantaneous and self-executing. Instead of placing the message in the possession of the carrier for transmission in his own way, while operating his own instrumentalities, the telephone instrument and line are placed in possession of the patron to be operated by him while the communication is being had. This distinction in the mode and manner of the use may afford a strong reason when the question is squarely presented for denying the relevancy of the principle affording a railroad company the primary right to deny another engaged in the same business the physical use of its appliances. It would seem in the case of the telephone, the use is of a character which impresses a public interest sufficient to repel the influence of the principle of immunity on the grounds of proprietary right as secondary to that which enjoins an efficient public service. On this question we give no opinion, for it is unnecessary to a proper disposition of the case. But when we remember that the rule referred to in respect to common carriers gen-

erally is predicated largely upon the necessities arising
from the stupendous occupation and the impracticabil-
ity incident to permitting one railroad to use the appli-
ances of another, the thought is suggested that the logic
of the doctrine might not enforce the same conclusion in
respect to telephones, for it is certain that many tele-
phone lines may be served at the same time through the
same switchboard in the same exchange without entail-
ing either confusion or danger. Be all of this as it may,
the disposition of the present appeal does not require
the court to give judgment to the effect that a physical
connection could be enforced between telephone compan-
ies in the first instance as a primary right. It is sufficient
to say that as the plaintiff and defendant in this case
saw fit to waive their primary right in the first instance
to deny a physical connection to any company engaged
in the telephone business, the matter must be disposed
of with reference to the secondary right of other com-
panies of the same class to be accorded equal facilities,
to the end that no unjust discrimination may be had.
Even though the rule obtains that such common carriers
as railroads have the primary right to control their own
stations and terminals and other appliances and to
deny the use thereof to a competitor, as has frequently
been declared, Ilwaco Ry Co. v. Oregon, etc., Co., 57
Fed. 673; Elliott on Railroads, sec. 1681 and authori-
ties supra, it is well settled that a railroad company
may not at common law grant an exclusive privilege
to another and connecting common carrier that oper-
ates an unjust discrimination as to others of the same
class in respect of equal facilities for an interchange
of business. As, for instance, if a railroad grants to
one connecting carrier certain privileges touching the
facilities for an interchange of business, it thereby pre-
cludes itself from asserting its primary right to deny to
others similarly circumstanced the same. In Florida,
a railroad company leased its entire wharf or landing
adjacent to the river to a particular navigation line and

accorded such navigation company an exclusive privilege to interchange business with it thereon. The court denied the validity of the exclusive privilege thus sought to be established and maintained the right of other connecting carriers to be afforded the same use of the railroad facilities for the same purpose. See Indian River Steamboat Co. v. East Coast Transportation Co., (Fla. Sup.) 10 South. Rep. 480.

In this State a railroad company granted to a connecting hack line an exclusive privilege of receiving and discharging passengers at a particular portion of its depot platform. At the suit of a rival hack line, the court declared the exclusive contract void for the reason it operated an unjust discrimination in facilities in favor of one common carrier against another. It may be, and no doubt is, true that neither of the hack lines involved in that case could enforce the right of a physical use of any particular part of the depot platform of the railroad company, but it appearing that the privilege had been granted to one to use a certain portion thereof, the court declared another could use the same portion, as an obligation existed in favor of all to the end that there should be no unjust discrimination. [Cravens v. Rodgers, 101 Mo. 247, 14 S. W. 106. See, also, McConnell v. Pedigo, 5 Am. & R. R. Corp. 711 Rep. and cases in note.]. These cases deal with the question of discrimination by one common carrier against another as to equal facilities for connecting business and that is this case, precisely, for the question relates not to an interchange of business. As to the reception and transmission of the business from other companies, the statute, supra, sec. 1255, pointedly lays this obligation on every company falling within its provisions.

The actual interchange of business between railroads and the transportation thereof by each connecting road for the other is a question which leads quite beyond the matter of equal facilities and essentially involves the right of contract between the parties as to the terms

on which each will do business with the other. Because of the right of contract and because it is not competent to make contracts for parties, the courts have hesitated to enforce, at the suit of one carrier, the identical privilege accorded to another on the grounds of discrimination for the interchange and transportation of connecting business. However, while it was held in the noted case of A. T. S. F. R. R. Co. v. D. & N. O. R. R. Co., 110 U. S. 677 that one connecting railroad company could not compel another to erect a station and interchange business at a particular point selected by the complaining company on the theory that the defendant had discriminated through entering into a business arrangement for interchanging traffic with another at the union station, the court nevertheless inferentially declared the right to equal privileges, even for interchanging business, existed and might have been enforced had the complainant been similarly circumstanced and sought to enforce the identical privilege accorded to the favored company. In that case the court said:

"A railroad company is prohibited, both by the common law and by the Constitution of Colorado, from discriminating unreasonably in favor of or against another company seeking to do business on its road. . . . The bill does not seek to reduce the local rates, but only to get this company put into the same position as the Denver & Rio Grande on a division of through rates. This cannot be done *until it is shown that the relative situations of the two companies with the Atchison, Topeka & Santa Fe, both as to the kind of services and as to the conditions under which it is to be performed, are substantially the same, so that what is reasonable for one must necessarily be reasonable for the other."*

That case clearly implies that the right of equal privileges as to interchanging business existed and would have been enforced had the complainant been circumstanced the same and sought an interchange of business at the union station such as was being afforded to

the favored company. It is true a different doctrine obtains under the Interstate Commerce Law as the direction of that act to afford equal facilities for interchanging business is said to be controlled and limited by another provision to the effect that it "shall not be construed as requiring a carrier to give the use of its tracks or terminals facilities to another carrier." [Little Rock, etc., R. R. Co. v. St. Louis & S. W. Ry. Co., 63 Fed. 775.] However, all of this is beside the question here, which is one of equal facilities and not as to interchanging business, and then, too, the duty to receive business from all companies is expressly imposed upon all telephone companies within its terms by section 1255, Revised Statutes, quoted. The principle portrayed in the cases above cited as to equal facilities, other than that under the Interstate Commerce Law, points the true course of decision on the facts before us, for it appears here that these telephone companies have granted to each other the right of a physical connection and deny it to other concerns of like kind similarly situated. This they may not do, for although a physical connection might not have been enforced in the first instance with the exchange of either company and would have been denied on the theory that it would involve an invasion of the primary right of the owner of the exchange to control its own property, the act of according a physical connection with each other operates to waive the primary right of either company and raises an enforcible obligation to accord the identical privilege to others.

As to the proposition that an enforcement of a physical connection of other telephone lines with the exchanges involved here is violative of the rights of property which inhere in the companies owning such exchanges, it is to be said that by entering into the avocation of furnishing the public with telephone service, the use operates to invest the public with an interest to which the private property rights referred to are

subject. Besides, each of these companies enjoy the special prerogatives of a corporate existence involved in their franchises granted by the state. Either the public use or the public grant referred to impresses the property with the public interest. The principle was announced in an early case as follows:

"Where private property is, by the consent of the owner invested with a public interest or privilege for the benefit of the public, the owner can no longer deal with it as his private property only, but must hold it subject to the rights of the public, in the exercise of that public interest or privilege conferred for their benefit." Allnutt v. Inglis, 12 East. 527.

In Munn v. Ill., 94 U. S. 113 (2d l. Ed. 77), private parties owned certain warehouses or elevators used in receiving, storing, assorting and reloading grain for transportation. The Legislature levied a tax on like property as though it concerned the public interest because of the use. In giving judgment on the validity of the tax, the Supreme Court of the United States said:

"Property does become clothed with a public interest when used in a manner to make it of public consequence and affect the community at large. When, therefore, one devotes his property to a use in which the public has an interest, he, in effect, grants to the public an interest in that use, and must submit to be controlled by the public for the common good, to the extent of the interest he has thus created. He may withdraw his grant by discontinuing the use, but so long as he maintains the use, he must submit to the control."

Aside from the question as to these companies enjoying their franchises as corporations granted by the state in which, of course, the public has an interest, it is clear from the authorities quoted that even if the two parties to this suit were private individuals, conducting a general telephone business, as they are, such use to which they have seen fit to devote their private property would impress the same with a public interest

sufficient to sustain the right of other telephone companies in successfully enforcing a physical connection with the exchanges mentioned to the end that no unjust discrimination should be had in serving all of the same class.

In keeping with this doctrine, the Supreme Court of Kentucky declared that where two telephone companies had entered into a contract for a physical connection by means of a switch in their exchanges and no time was limited when such contract should expire, the right to maintain such physical connection continued as long as either continued to exercise its franchise as a telephone company. The reasoning of the court on that question recognized the primary right of the contracting companies in the first instance to control their instrumentalities and said that it was a proper matter of contract primarily, but as they had contracted with reference to the same without limitation as to time when the right of connection should expire, the matter was, because of the use, one of public concern and therefore the relation thus established could not be severed by the withdrawal of one company so long as it remained in the telephone business. [Campbellsville Co. v. Lebanon Co., 118 Ky. 277, 80 S. W. 1114, 84 S. W. 518.]

In view of the doctrine hereinbefore adverted to, the Supreme Court of Indiana very recently in State ex rel. Goodwine v. Cadwallader, 87 N. E. 644, declared that although telephone companies might refuse in the first instance to accord a physical connection with other lines through their exchanges that if they saw fit to grant the right to one company, the public interest required the same privilege should be accorded to others. It is said that as the company saw fit to waive its primary right with respect to the absolute control of its own property and grant a physical connection to another telephone line such voluntary act raised an obligation to grant an equal privilege without discrimination to

147 App—16

others engaged in the same calling and that this obligation was one which the courts would enforce by mandamus. To the same effect is the well considered case of United States Telephone Co. v. Central Union Telephone Co., 171 Fed. 130.

We therefore conclude that as by the contract involved here the defendant granted the right of a physical connection with its exchange to the plaintiff this raised an obligation on the part of defendant to grant the same right to other telephone companies as well and that the provisions in the contract to the effect that like advantages and privileges should be granted to no other person or corporation are void and of no effect. The contract being void, of course, it may not be enforced in this proceeding.

Another feature of the case arises under the provisions of our statutes, section 1256, which is as follows:

"Where the person sending the dispatch desires to have it forwarded over the lines of other telephone or telegraph companies, whose termini are respectively within the limits of the usual delivery of such companies, to the place of final destination, and shall tender to the first company the amount of the usual charges for the dispatch to the place of final delivery, it shall be the duty of the company to receive the same, and, without delaying the dispatch, to pay to the succeeding line the necessary charges for the remaining distance; and it shall be the duty of the succeeding line or lines to accept the same, and forward the dispatch in the same manner as if the person sending the same had applied to the agent or operator of such line or lines in person, and paid to him the usual charges; and for omitting so to do the company or companies owning or operating such line or lines shall severally be liable to the penalty prescribed in section 1255."

This section clearly recognizes the right of a person sending a telephone message over the lines of one company to direct by what connecting line it shall be

transmitted, provided the facilities for the reception of business of such connecting system are within the limits of the usual delivery of the initial company, and affixes an obligation upon the initial company to forward the message as directed by its patron. There can be no doubt of the right of the sender of the message, at common law, to select the route and the connecting agency by which it is to be transmitted. [Jones on Telephones, sec. 463.] Now, the contract before us pointedly stipulates that all messages arising on the lines of either of the parties, destined to points on lines of the other which are not reached by the lines of the initial carrier, shall be transmitted over the lines of the other. This provision is, no doubt, violative both of the common law right of the sender referred to and of the statute above quoted as well. To illustrate, a patron of the Granby & Neosho Telephone Company at Granby may desire to communicate with some one at Joplin who has a Bell telephone in his office and upon requesting from the Granby Company the privilege of communicating through its exchange over its lines and the Bell lines as well is entitled to be accorded the privilege. Notwithstanding this right of the sender, the contract pointedly stipulates that the Granby Company shall have no right to transmit messages to Joplin over any line other than those of the plaintiff. It appears both the plaintiff and the Bell system maintain lines between Granby and Joplin. For the Granby Company to grant to its patrons this right which the law secures to select the connecting carrier, essentially operates a breach of the contract between these parties which accords an exclusive privilege to the plaintiff company as to the transmission of such message. It appears, therefore, that the exclusive right as to transmission referred to is violative both of the statute and the common law on the question and is therefore void and of no effect.

Another section of our statute (sec. 1254) authorizes the joint use of telephone lines. This statute is as follows:

"Any company incorporated as herein provided may contract, own, use and maintain any line or lines of telephone or magnetic telegraph, whether wholly within or wholly or partly beyond the limits of this State, and shall have power to lease or attach to the line or lines of such company other telephone or telegraph lines, by lease or purchase, and may join with any other corporation or association in constructing, leasing, owning, using or maintaining their line or lines, upon such terms as may be agreed upon between the directors or managers of the respective corporations, and may own and hold any interest in such line or lines, or become lessees thereof, on such terms as the respective corporations may agree."

It is argued by the plaintiff that as this section authorizes telephone companies to join in using their lines, the contract before us is thus expressly authorized by the statute. We are not so persuaded. The several statutes quoted are *in pari materia* and must be read and interpreted together. There are many plans by which telephone companies may join in using their respective lines without affording to either an exclusive privilege or operating a discrimination against those rightfully entitled to the same privileges. The statute quoted obviously contemplates that such companies may join in using their lines or system in a manner not violative of the other statutes referred to. Section 1255 declares the common law obligation of telephone companies to deal impartially and with good faith towards all other telephone companies in the matter of the reception and transmission of messages. This means, as said by the Supreme Court of Ohio, in State v. Bell Telephone Co., 36 O. 296, that they shall accord equal privileges to all of the same class and that there shall be no unjust discrimination. When section 1254, above

quoted, is interpreted in the light of the common law obligation thus declared in section 1255, it is certainly clear that the joint use of telephone lines authorized relates to a use not unlawful by operating an unjust discrimination.

We believe, too, the exclusive privilege accorded in and now sought to be enforced under the contract is violative of the public policy of the State as declared in section 8978, Revised Statutes 1899, section 8978, Ann. St. 1906, and therefore void. The contract stipulates that each of the two companies shall have the exclusive right to transmit over its lines all messages coming from the lines of the other which are destined to points on lines of the connecting company and not reached by the lines of the initial carrier. When this provision is analyzed, it is observed that it requires each of the parties to transmit all messages either passing over its lines. or originating with it and destined to points on the lines of the other not reached by its own lines, over the lines of the other party, to the exclusion of all others.

Each company may discharge its full duty to the public by carrying the message of its patron to the end of its own line and delivering the same with reasonable promptness and due care to the connecting carrier. In performing this duty in respect to a message not routed by the sender by delivering to and forwarding a message over a connecting line, the initial carrier assumes the attitude of a purchaser of the convenience or commodity of telephone service from the connecting carrier to transmit the message to destination. And identically as the initial carrier of the message becomes a purchaser of the service of the connecting company to complete the transmission, so the connecting company becomes the seller of its service to the end of transmitting the message over its own lines.

Thus viewed, it is obvious that the two telephone companies are engaged to some extent in buying and

selling telephone service from and to each other. At any
rate the contract contemplates a situation where such
should be the case.  The contract provides in other por-
tions how the connecting carrier is to be paid for such
services by accepting from the initial carrier such per-
centage of the compensation collected as accords with
the relative number of miles the message is transmitted
over its lines as compared with those of the other com-
pany.  Now, so much of the statute as is relevant to
this feature of the case is as follows:

"If any two or more . . . corporations who
are engaged in buying or selling any . . . com-
modity, convenience . . . or any article or thing
whatsoever, shall enter into any . . . agreement
. . . or understanding . . . to limit competi-
tion in such trade, by refusing to buy from or sell to
any other person or corporation any such article or
thing aforesaid, for the reason that such other person
or corporation is not a member of or party to such
. . . combination, confederation, association or un-
derstanding . . . it shall be in violation of this
article."   [Sec. 8978, R. S. 1899, Ann. St. 1906, sec.
8978. ]

This statute is said by our Supreme Court to be
in aid of the common law, therefore not to be strictly
construed.  [State ex inf. Hadley v. Standard Oil Co.,
218 Mo. 1, 116 S. W. 902.]

In this view, it is certainly proper to treat tele-
phone service as a convenience or commodity being
bought and sold between those companies.  It is very
true that under the contract either one of the parties
thereto are free to sell their service to whomsoever they
will.  The right to sell the convenience or commodity
of telephone service is not sought to be restrained by
the contract.  However this may be, it is otherwise as
to the right of either company to buy the convenience
or commodity of telephone service for the purpose of
transmitting messages which originate on or pass from

the lines of one company and are destined to points on the lines of the other not reached by the initial carrier. In respect of such messages, neither company is permitted to buy the commodity or convenience of telephone service from any company other than the party to the contract. To illustrate, it appears that both the Home Telephone Company and the Missouri & Kansas Telephone Company or Bell line, which is not a party to the contract, at present connect through a switchboard with the Granby & Neosho Company at Granby. Now, suppose a patron of the Granby & Neosho Company, in his residence at Granby, desired to communicate by telephone with some person at Joplin, to which point both the Home Telephone Company and the Missouri & Kansas Telephone Company maintain lines. Upon signifying his intention to that effect, through the telephone to the operator in charge of the Granby Company's switchboard at the Granby exchange, it immediately becomes the duty of the Granby company, under this contract, to connect such patron with the city of Joplin office over the line of the Home Telephone Company to the exclusion of the Missouri & Kansas Telephone Co. Therefore, the contractual provision mentioned requires the Granby Company to buy the service between Granby and Joplin from the Home Telephone Company to the exclusion of all others. And this is true even though another company may afford better facilities and more prompt service.

It is entirely clear that such an arrangement as that portrayed above operates to limit competition in respect to such commodity or convenience as telephone service as is proffered or available for the transmission of messages in the territory occupied by these companies and attempts to confer a complete monopoly on each of the contracting parties with respect thereto.

As the contract assures to each company the exclusive right to transmit all messages, or, in other words, furnish the service for all messages originating

on or passing from the lines of the other destined to points on its own lines and not reached by lines of the initial carrier, this of course requires that the initial carrier shall not buy such service to the same end from any other company not a party to the contract. The arrangement therefore falls within the very words of the statute and is subject to its inhibition. The exclusive privilege referred to, if valid, will confer a complete monopoly on the two contracting companies with respect to the business mentioned and prohibit either from buying like service of all other companies for the reason they are not parties to the contract and the contract is therefore void.

The judgment should be affirmed. It is so ordered. *Goode, J.,* concurs. *Reynolds, P. J.,* dissents.

## DISSENTING OPINION.

REYNOLDS, P. J.—I am compelled to dissent from the views expressed and the conclusion arrived at by my brother NORTONI, in his very learned and exhaustive opinion. The contract between the plaintiff and defendant, as I read it, did not in any manner hinder any other company from carrying on and competing for business. Nor did it promote a monopoly. Neither did the contract prohibit other concerns from using the facilities of the Granby & Neosho Company to as full an extent as any other of its customers might use them. It is against such agreements that our statute is aimed. It is for the protection of the public against monopolies and extortion. Beyond doing that they do not attempt to go. It is not within their letter or spirit to require one who has by his means and labor and brain built up a business to let everyone or anyone else into its enjoyment. What he is to do is to so conduct his business that in his dealings with the public all are treated alike. Fairness and equality to all, favors or special privileges in the conduct of the busi-

ness as a public business to none, is the life of the law. This is very far from letting another in the same line of business into a participation in that business, even if the owner, by his voluntary act has chosen to let in some other. It is the public who is under the protection of the law and the courts. Neither are concerned in promoting the interests of one corporation as against another. The defendant was and is bound to allow the Missouri & Kansas Telephone Company, a corporation, but for many purposes in law, a person, a citizen, to have access to its lines and connection with its subscribers, just as it was bound to allow any lawyer, bank, merchant or other citizen. That is the case of State ex rel. B. & O. Tel. Co. v. Bell Tel. Co., 23 Fed. Rep. 539, and of State ex rel. v. Kinloch Tel. Co., 93 Mo. App. 349, 67 S. W. 684, and kindred cases cited by my learned brother. That is all the law, common or statutory, demands. But the defendant proposes to do and is doing more than this with the Missouri & Kansas Telephone Company. It installed an exchange for it in connection with its own exchange, took it in or let it into its business, not as a patron and customer, but as a joint operator, so to speak, of its own system, and this it had no right to do under its contract with plaintiff. The trouble with the opinion of my learned brother, in my judgment, is, that two ideas are confused: One the right of all the public to enjoy equal privileges with every one else of the public in the use of telephone service over defendant's line; the other, the right of the defendant, notwithstanding its contract with plaintiff, to allow another company, engaged in the same business, the same rights granted plaintiff; in short the right to become a part of its system. I do not think our statute requires this, any more than, by way of illustration, when it requires one railroad to connect with another for transfer of traffic from one to the other, it requires it to allow that other the use of its tracks or engines, or its station houses or freight ware-

houses, merely because it has allowed some one or other road these facilities for business. Thus one road may agree with another to share with it the use of its tracks or motive power. That would not compel it to allow another company like participation. I know it is said in the U. S. Tel. Co. v. Central Tel. Co. case, 171 Fed. Rep. 130, a case greatly relied on by my learned brother, that while the above is true as to railroads, it does not apply to telegraphs and telephones, and especially does not apply to the latter because telephone service and railroad service are so different that the rule applied to one does not necessarily apply to another. That the physical differences are present, I admit, but I deny that this changes the principle which I think is as applicable to one as to the other. Take the case of a public grain elevator. It must receive, store, handle and transmit the grain of every one who offers it for those purposes. That does not mean Elevator A must allow a rival, Elevator B, to handle the grain of the latter, destined for the latter's customers through Elevator A and to use Elevator A's facilities for that purpose. Elevator A will and it must handle the grain of its rival, when offered to it, just as it does that of any other customer—that and no more.

I do not think any decision of our own appellate courts or of our Supreme Court calls for the interpretation which my learned brother has put on this contract, nor that our statute, properly construed, annuls it. Furthermore, I think a construction of our statute which would compel one company to subject all its facilities to the use of a third party merely because by contract, it had let in another to the enjoyment of them, would violate the constitutional guarantee of protection in the use and enjoyment of one's own property. Telephone and telegraph companies are common carriers *sub modo* only. That they, like railroads, are what are so aptly called public service corporations, is beyond question. But this does not destroy the right of prop-

erty or of contract. The decisions cited from other jurisdictions in support of my brother's contention are not controlling on us and I do not agree to them. The argument, hinted at, more than distinctly made, that in the telephone service, every patron is his own operator, and that all the telephone company does is to put up the poles and wires and install the boxes, and make the talking connection between one patron and another, and that its patrons then become the real operators, is more fanciful than sound. It does not meet the hard fact that without the placing and maintenance of these appliances and means for putting the electric forces at work, one could not send his voice from house to house, from farm to farm, from town to town. It is the placing and maintenance and operating of the plant by the owner that allow patrons to communicate with each other. The company owns the plant, the patrons do not.

I think the contract between the plaintiff and the defendant violated no law, common or statutory, and is a valid one. It is limited both as to duration and place of operation. Defendant is a small local· company, a neighborhood line, intended more for neighborhood convenience than profit. It is of a class that deserves promotion. By the contract with plaintiff defendant afforded its patrons access to a territory that without that contract could not have been reached by them. That contract at the time made undoubtedly helped out the small company. If we strike down that contract and allow defendant to avoid it now that it seems profitable to it to do so, the inevitable effect will be to discourage the building and establishing of these small, local companies. As I understand this case, we are far more apt to build up and strengthen a powerful monopoly by striking down this contract than by upholding it. .

If defendant breached it, as alleged, it is liable, as in any other such case, for damages in an action at law; or if, as alleged, an action at law does not afford a

complete, an adequate remedy, then equity may be invoked, as here.

Believing that both the argument advanced and the conclusion reached by the majority are wrong, and without attempting further or fuller elaboration of my reasons for so doing, I am compelled to and do dissent.